UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Michael Barca,

    Plaintiff,

    v.                                    Civil Action No. 2:16-cv-187

Commissioner of Social Security,

    Defendant.

## OPINION AND ORDER
(Docs. 14, 21)

Plaintiff Michael Barca brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security (Commissioner) denying his February 2013 applications for Disability

Insurance Benefits (DIB) and Supplemental Security Income (SSI).  Pending before the

Court are Barca's motion to reverse the Commissioner's decision (Doc. 14), and the

Commissioner's motion to affirm the same (Doc. 21).  For the reasons stated below, the

Court DENIES Barca's motion, and GRANTS the Commissioner's motion.

## Background

In January 2014, this Court issued an order denying a prior DIB application of

Barca's.[1]  *See Barca v. Comm'r of Soc. Sec.*, Civil Action No. 2:13-CV-68, 2014 WL

257858, at *1 (D. Vt. Jan. 23, 2014).  Therein, the Court summarized the facts as follows

---

[1] Barca has filed "multiple prior [disability] applications," as discussed in a footnote to the Administrative Law Judge's decision in this case.  (AR 14 n.1.)

After graduating from high school, [Barca] served in the Marines for approximately four years. Thereafter, he was an emergency medical technician for approximately eight years. Since 1996, he has held many jobs, including a road flagger, a security officer, a sales associate, a cook, a teacher's aide, a construction worker, and a taxi driver. He claims he has been unable to hold most of these jobs for more than a few weeks.

As a child, Barca was physically abused by his father. He was married in 1994, and he and his wife had three children and adopted a fourth. The couple had problems with their eldest son, and Barca told one of his medical providers that when this son was 14, he sexually molested the couple's then four-year-old son. In July 2008, Barca was fired from his job as a security officer, which he had held for almost five years, due to his theft from a client. In January 2009, Barca was charged with arson of the family residence. Around the same time, Barca's marriage ended in divorce, largely due to Barca's economic and vocational instability and his anger issues. In 2011, feeling despondent from his divorce and estrangement from his children, Barca attempted suicide by overdosing on his medications. At that time, he was living with his brother-in-law and his family, including nine children. In June 2012, Barca was living alone in an apartment subsidized by a Veteran's Affairs . . . housing program. He saw his children infrequently but was well connected with a local church and close with his sisters.

Despite having gastric bypass surgery in 1998, Barca is morbidly obese. He suffers from depression, posttraumatic stress syndrome . . . , and cellulitis. He has nightmares, which prevent him from sleeping through the night. His cellulitis causes swelling in his legs if he sits or stands for extended periods, and his psychological problems result in problems concentrating and handling stress.

*Id.* at *1 (citations omitted). In a June 2011 Intake Evaluation, it was noted that Barca has a "no[-]contact order" that prevents him from being able to spend time with his children (AR 633), and that he reported approximately 30 jobs in the prior few years, each of which ended with him quitting or being fired, and approximately 50 jobs since Barca left the Marines in 1981 (AR 633–34).

Barca was 54 years old on his amended alleged disability onset date of January 19, 2013. In February 2013, he filed the DIB and SSI applications currently under review, alleging that he has been unable to work due to "[m]anic depression acute," posttraumatic stress disorder (PTSD), "extreme suicidal anxiety," lymphedema,[2] cellulitis,[3] and high blood pressure. (AR 494.) Barca's applications were denied initially and upon reconsideration, and he timely requested an administrative hearing. On December 11, 2014, a hearing was conducted by Administrative Law Judge (ALJ) Matthew Levin. (AR 38–63.) Barca appeared and testified, and was represented by an attorney. A vocational expert (VE) also testified at the hearing. (AR 55–62.) Barca testified that, as a result of his lower extremity condition (cellulitis, lymphedema, a combination of the two, or something else), he is unable to stand or sit for lengthy periods (more than 15–20 minutes) or his legs will begin to swell, becoming very painful. (AR 49–50, 503.) In a Function Report, Barca explained that, when his legs swell, he suffers "excruciating" pain, making it difficult to walk. (AR 531.) Barca further testified that he experiences swelling in his legs on a daily basis and has to elevate them for eight hours before the swelling goes down. (AR 49.) Barca explained that, due to his lower extremity pain and swelling, he has difficulty performing activities of daily living including showering,

---

[2] "Lymphedema" is "[s]welling . . . as a result of obstruction of lymphatic vessels or lymph nodes and the accumulation of large amounts of lymph in the affected region," *Stedman's Medical Dictionary* 516910 (2014), generally occurring in one or both arms and legs.

[3] "Cellulitis" is "[i]nflammation of subcutaneous, loose connective tissue," *Stedman's Medical Dictionary* 159930 (2014), resulting in infection which may lead to swelling, redness, or pain.

dressing, and completing household chores.  (AR 52–53.)  His pain also results in him being able to sleep for only about three to four hours each night.  (AR 532.)

Despite his extensive testimony and reporting about his lower extremity condition, Barca stated at the administrative hearing that, of all his impairments, his "anxiety disorder" is the one that most prevents him from working.  (AR 47.)  Barca testified that, due to his anxiety and "severe depression," he cannot work with people and he feels suicidal three or four times each month.  (AR 47–48.)  In a Function Report, Barca further stated that his PTSD limits his ability to concentrate and retain even simple information.  (AR 531.)

On February 4, 2015, the ALJ issued a decision finding that Barca was not disabled under the Social Security Act at any time from his amended alleged disability onset date through the date of the decision.  (AR 14–28.)  Thereafter, the Appeals Council denied Barca's request for review (AR 1–6), rendering the ALJ's decision the final decision of the Commissioner.  Having exhausted his administrative remedies, Barca filed the Complaint in this case on July 6, 2016.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe

impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to

whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The

claimant is presumptively disabled if his or her impairment meets or equals a listed

impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the

claimant's residual functional capacity (RFC), which means the most the claimant can

still do despite his or her mental and physical limitations based on all the relevant

medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1),

416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the

claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§

404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the

claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant

bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at

383; and at step five, there is a "limited burden shift to the Commissioner" to "show that

there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566

F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step

five is limited, and the Commissioner "need not provide additional evidence of the

claimant's [RFC]").

Employing this sequential analysis, ALJ Levin first determined that, although Barca had engaged in some work activity after the amended alleged disability onset date, he had not engaged in substantial gainful activity (SGA). (AR 17.) At step two, the ALJ found that Barca had the following severe impairments: obesity, lymphedema/cellulitis (lower extremities), depression, an anxiety-related disorder, and personality disorder traits. (*Id.*) Conversely, the ALJ found that the following impairments were not severe, due to a lack of evidence: hearing and vision loss, hypertension, and loss of a portion of right index finger. (AR 18.) The ALJ noted, however, that he considered these impairments in assessing Barca's RFC. (AR 19.) At step three, the ALJ found that none of Barca's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 19–21.)

Next, the ALJ determined that Barca had the RFC to perform "light work," as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except as follows:

> [Barca] must be able to sit and elevate his legs for 3–5 minutes an hour. He is able to perform simple, unskilled work in a low[-]stress environment, which is defined as requiring little to no change in the work setting and little to no need for the use of judgment. He is able to maintain attention and concentration for two-hour increments throughout the course of an 8-hour workday and to have brief and superficial social interaction with the general public and co[]workers and routine collaboration with supervisors.

(AR 21.) Given this RFC, and relying on the VE's testimony from the administrative hearing, the ALJ found that Barca was capable of performing his past relevant work as a "flagger." (AR 27.) The ALJ concluded that Barca had not been under a disability from

his amended alleged disability onset date of January 19, 2013, through the date of the decision.  (*Id.*)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>**Analysis**</u>

Barca makes the following claims: (1) the ALJ erred at step two in finding that Barca's hypertension was not a severe impairment; (2) the ALJ made several errors in his RFC determination, including failing to consider all of Barca's impairments in combination; (3) the ALJ erred in his analysis of the medical opinions; (4) the ALJ erred in his consideration of Barca's ability to handle stress; and (5) the ALJ erred at step four in finding that Barca was able to perform his past relevant work as a flagger. (*See* Doc. 14.) The Commissioner disagrees with each of these arguments, and contends that the ALJ's decision is supported by substantial evidence and reflects the ALJ's application of the correct legal standards. (*See* Doc. 21.) As explained below, the Court agrees with the Commissioner and thus affirms the ALJ's decision.

**I.      ALJ's Step-Two Analysis of Hypertension**

The Court finds no merit to Barca's claim that the ALJ erred in finding Barca's hypertension to be non-severe at step two of the sequential analysis. (*See* Doc. 14 at 6.) It is the claimant's burden to show at step two that he or she has a "severe impairment,"

meaning an impairment which "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); *see Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so."). An impairment is "not severe" when medical evidence establishes "only a slight abnormality . . . which would have no more than a minimal effect on [the claimant's] ability to work." SSR 85-28, 1985 WL 56856, at *3 (1985).

The ALJ explained in his decision that Barca's hypertension was not a severe impairment because "the record fails to reveal evidence of anything more than some minimal resultant functional limitation related to the[] impairment[]." (AR 19.) Although Barca cites to medical records indicating that he was diagnosed with hypertension at various times throughout the alleged disability period (*see, e.g.*, Doc. 14 at 8), it is well settled that the diagnosis of a condition "says nothing about [its] severity," *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988), and is not sufficient to prove disability, *Williams v. Bowen*, 859 F.2d 255, 259 (2d Cir. 1988). *See McConnell v. Astrue*, No. 6:03-CV-0521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008) ("The mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment is not, itself, sufficient to deem a condition severe." (internal quotation marks omitted)).

Moreover, as the ALJ noted in his decision, the record clearly demonstrates that Barca was noncompliant with treatment recommendations regarding his hypertension.

(*See* AR 23 (citing AR 1462).)  For example, in a September 2014 treatment note,

Dr. Devine stated: "This was to be a follow[-]up [appointment regarding Barca's]

malignant hypertension but again [Barca] did not take his meds!!!"  (AR 1462.)

Dr. Devine continued: "[Barca] [a]gain remains much more focused on his court case

than on his health and I am not able to get him to take his blood pressure seriously."  (*Id.*;

*see also* AR 1468 ("continues to literally laugh . . . off [his hypertension]").)[4]  The

regulations provide that if a claimant fails to follow prescribed treatment without a good

reason, the Commissioner will not find the claimant disabled.  20 C.F.R. § 404.1530(b);

*see also* 20 C.F.R. § 404.1529(c)(3) ("treatments or other methods" used to alleviate a

claimant's pain are "an important indicator of the intensity and persistence" of the

claimant's pain); *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) (affirming

denial of benefits where claimant failed to heed doctor's diet recommendation which

would have helped hypertension and headaches).  Barca has offered no good reason for

his failure to comply with prescribed treatment regarding his hypertension.

Furthermore, even if the ALJ erred in failing to find Barca's hypertension severe,

remand is not required on this ground, because the ALJ continued through step four of

the sequential analysis, explicitly considering Barca's hypertension in subsequent steps.

*See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding step-two error

---

[4]  The record reflects that Barca was also noncompliant with treatment recommendations regarding his obesity, which is a risk factor for hypertension.  For example, in a March 2013 treatment note, Dr. William Arban recorded that Barca appeared to be "in blithe denial that he has a problem [with his weight]," and that Barca stated "he is unable to eat a healthy . . . diet [and] exercise . . . due to a living situation that he says makes him unable to prepare healthy meals at home."  (AR 734.)

harmless because ALJ considered impairments during subsequent steps); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (same); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two . . . , the question of whether the ALJ characterized any other alleged impairment as severe . . . is of little consequence.").

## II.    ALJ's RFC Determination

The Court also finds no merit to Barca's claim that the ALJ made several errors in his RFC determination.  Barca asserts that the ALJ erred in omitting agency consultant Howard Goldberg, PhD's one-to-three-step task limitation, failing to account for Barca's lower extremity condition, and failing to consider Barca's impairments in combination. (*See* Doc. 14 at 10.)  Barca's argument appears to misconstrue the ALJ's role in determining a claimant's RFC.  (*See id.* at 5 (finding fault with the ALJ's RFC determination in part because it did not track that of the agency consultants, instead "elevat[ing] one physical condition . . . from non-severe to severe, add[ing] one mental condition . . .[,] and downgrad[ing] another . . . .").)  The ALJ's RFC determination need not "perfectly correspond with any of the opinions of medical sources cited in his decision"; rather, the determination must be the result of the ALJ's weighing of "all of the evidence available to make an RFC finding that [is] consistent with the record as a whole."  *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).

A claimant's RFC is "the most [he] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1).  Under the applicable regulation, the ALJ must assess the

claimant's RFC "based on all of the relevant medical and other evidence."  *Id.* at (a)(3).

"In general," it is the claimant who is "responsible for providing the evidence . . . use[d]

to make a finding about [the claimant's] [RFC]."  *Id.*; *see* 20 C.F.R. § 416.912(a)(1)

("You must inform us about or submit all evidence known to you that relates to whether

or not you are . . . disabled."); *Butts*, 388 F.3d at 383 (claimant bears burden of proving

case at steps one through four).  Here, as noted above, the ALJ determined that Barca's

RFC was for "light work" but with several additional limitations, including a need to sit

and elevate his legs for three to five minutes each hour, and a requirement that he do only

simple, unskilled work in a low-stress setting, with only brief and superficial social

interaction with the general public and coworkers.  (AR 21.)  The ALJ explained that this

RFC is "supported by opinion evidence offered by the State Disability Determination

Service medical and psychological consultants, whose opinions are found to be consistent

with the evidence of record as a whole."  (AR 27.)  Substantial evidence supports this

determination, and the Court finds no legal error, as discussed below.

### A.    Dr. Goldberg's One- to Three-Step-Task Limitation

First, Barca claims the ALJ erred in omitting agency consultant Dr. Goldberg's

one- to three-step-task limitation in his RFC determination.  (*See* Doc. 14 at 4.)  But the

ALJ adequately accounted for this limitation by restricting Barca to performing only

"simple, unskilled work."  (AR 21.)  Work that is described as "simple" and "unskilled,"

by definition, could not require more than three steps to perform.  *See*

https://www.collinsdictionary.com/us/dictionary/english (last visited 7/12/17) (defining

"simple" as "not involved or complicated; easy to understand or do" and "unskilled" as "requiring or using no special skill or training"); *see also* SSR 85-15, 1985 WL 56857, at *4 (1985) ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions.").

### B.    Lower Extremity Condition

Second, Barca contends the ALJ erred in failing to account for Barca's lower extremity condition in his RFC determination.  (*See* Doc. 14 at 2–3, 5.)  But the ALJ included in his RFC determination a limitation that Barca "must be able to sit and elevate his legs for 3–5 minutes an hour" (AR 21), as opined by agency consultant Ann Fingar, MD (AR 230; *see* AR 25 (ALJ giving "great weight" to Dr. Fingar's opinions)), and the record does not support a more severe limitation.  The ALJ explained his RFC finding regarding Barca's lower extremity condition in his decision (AR 22), accurately noting that, although Barca had a history of treatment for recurrent episodes of cellulitis and edema/swelling in his legs, treating physician Dr. Richard Baughman stated in a January 2013 treatment note that Barca was "under excellent management for his lymphedema[,] which is responding to compression," and that Barca was "avoiding cellulitis" (AR 963). The ALJ further noted, correctly, that Barca was "less than fully compliant with treatment prescribed to address [his lower extremity condition]."  (AR 22.)

An April 2014 physical therapy note supports the findings regarding Barca's lower extremity condition, stating that, although Barca had a NormaTec device to assist with

his leg swelling, he "has not been using it"; and that Barca "[a]ppears to have the tools necessary to address his swelling concerns, but is having difficulty following through with a plan." (AR 1407.) The note further states that, "within a few minutes" of elevating his leg and performing "ankle pumps," Barca noted improvement in his symptoms. (*Id.*) Finally, the treatment note states that Barca was "working 5–6[-]hour[] shifts as a cook" and needed to increase those hours in order to "provide increased child support." (*Id.*) The ALJ questioned Barca about this work at the administrative hearing, wondering how he could remain on his feet for such a long time during the alleged disability period, and Barca responded: "I just did it. I know if I complained about the pain, they would cut my hours, and at the time, I was being pressured with my child support judges[, who basically threatened me with jail in order to make me work]." (AR 53; *see also* AR 23, 25.)

## C. Combination of Impairments

Third, Barca claims the ALJ erred in "fail[ing] to consider the various connected physical impairments, namely, obesity, lymphedema/cellulitis/edema, hypertension[,] and visual loss in combination." (Doc. 14 at 7.) Barca states that the ALJ improperly "failed to acknowledge that all of these conditions are interrelated and, as such, required a more restrictive RFC than he adopted." (*Id.*) A review of the ALJ's decision demonstrates, however, that the ALJ considered each of these conditions; and the decision explicitly states that the ALJ "consider[ed] all of [Barca's] . . . medically determinable physical impairments upon assessing his [RFC]," including even those found to be non-severe.

(AR 19.)  Regarding Barca's vision problems, the ALJ's RFC determination does not account for them because neither Barca nor his treating providers attributed any functional limitations to them, as the ALJ explained in his decision.  (*See id.* (citing AR 1009) (Dr. Devine checking box indicating that Barca had no limitation in his ability to see).)  Regarding Barca's obesity, lymphedema/cellulitis/edema, and hypertension; the ALJ particularly noted Dr. Devine's findings in treatment notes that Barca's obesity was "the primary driver of his dependent edema" (AR 23 (citing AR 1462)), and that Barca continued to gain weight "despite the fact that his obesity is noted to be the direct cause of many of his health issues" (AR 23 (citing AR 1468)).  Even if the ALJ had not explicitly considered Barca's impairments in combination, where, as here, the ALJ's decision identifies each of the claimant's impairments, the decision is "not vulnerable to . . . reversal" on the ground that the ALJ failed to consider all of the claimed impairments in combination.  *Tinsley v. Barnhart*, Civil No. 3:01CV977(DJS)(TPS), 2005 WL 1413233, at *6 (D. Conn. June 16, 2005); *see Forrest v. Astrue*, Civil Action No. 2:10–CV–20, 2011 WL 759401, at *11–12 (D. Vt. Feb. 24, 2011).

## III.    ALJ's Analysis of the Medical Opinions

Next, Barca argues that the ALJ improperly rejected the medical opinions of treating primary care physician Katherine Devine, MD, treating psychiatrist Scott Rebhun, MD, and treating therapist Tony Graveline, MA, LADC, QMHP.  (*See* Doc. 14 at 10–11.)  As discussed below, the argument lacks merit.

The ALJ was required to analyze the opinions of treating physicians Dr. Devine and Dr. Rebhun under the treating physician rule, which states that a treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well[]supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(c)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 567–69 (2d Cir. 1993).  When controlling weight is not given to a treating physician's opinions (because they are not "well[]supported" by other medical evidence or are "inconsistent" with other substantial evidence), the ALJ must consider the following factors in determining how much weight, if any, to give the opinions: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinions are with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Shaw*, 221 F.3d at 134.

Treating physician opinions may be rejected based on the ALJ's proper consideration of any of these factors, and the ALJ need not expressly recite each factor in his decision.  *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.") (citing *Halloran*, 362 F.3d at 31–32).  Nonetheless, ALJs must

"always give good reasons" for the weight they assign to a treating source's opinions,

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), and failure to do so is ground for remand,

*Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not

provided 'good reasons' for the weight given to a treating physician[']s opinion[s] and

we will continue remanding when we encounter opinions from ALJ[]s that do not

comprehensively set forth reasons for the weight assigned to a treating physician's

opinion[s].").  Examples of "good reasons" to discount the opinions of a treating

physician include the following: the opinions are inconsistent with the bulk of the other

substantial evidence, such as the opinions of other medical sources, *see Williams v.

Comm'r of Soc. Sec.*, 236 F. App'x 641, 643–44 (2d Cir. 2007); *Veino v. Barnhart*, 312

F.3d 578, 588 (2d Cir. 2002); the opinions are internally inconsistent, *see Micheli v.

Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012); the physician's relationship to the claimant is

"limited and remote," *see Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011); and the

treating source lacked underlying expertise and gave only brief, conclusory opinions

unsupported by clinical findings or other evidence, *see* 20 C.F.R. § 404.1527(c)(3), (5).

Unlike the opinions of Drs. Devine and Rebun, the ALJ was not required to

analyze the opinions of treating therapist Graveline under the treating physician rule,

because therapists are defined in the regulations as "other sources," 20 C.F.R. §

404.1513(d),[5] rather than "acceptable medical sources" like licensed physicians and

---

[5]  Effective March 27, 2017, 20 C.F.R. § 404.1513 has been amended, as have other social security regulations regarding the evaluation of medical evidence.  Nonetheless, because Barca's social security application was filed before the new regulations went into effect, the Court reviews the ALJ's decision under the earlier regulations.

psychologists, *id.* at § 404.1513(a). Although these "other source" opinions may be used "to show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work," 20 C.F.R. § 404.1513(d)(1), ALJs are not required to evaluate them in the same manner as required under the treating physician rule, 20 C.F.R. § 404.1527(a)(2). *See* SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006); *Duran v. Comm'r of Soc. Sec.*, 296 F. App'x 134, 136 (2d Cir. 2008) (finding no error in ALJ decision to disregard assessment of "medical records physician" because it was not from an acceptable medical source and did not include clinical findings). Still, ALJs are required to consider and analyze these opinions "on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file," SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006), and they must use the same factors for evaluating these opinions as are used to evaluate opinions from "acceptable medical sources," *id.* at *4 (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)), including the length of the treatment relationship, the frequency of evaluation, the degree to which the opinion is supported by other evidence, and the opinion's consistency with the record as a whole.

A.     **Dr. Devine**

Barca argues that the ALJ should have considered the applicable criteria in weighing the value of Dr. Devine's opinions. (*See* Doc. 14 at 11.) And the ALJ clearly did so. Specifically, the ALJ explained that, despite Dr. Devine's status as Barca's "primary care provider," he gave "[l]imited weight" to Dr. Devine's opinions because they are not supported by "any specific medically documented objective findings" or by

Dr. Devine's own treatment notes, and because they are not consistent with the record as a whole. (AR 25–26.) As discussed above, supportability and consistency with the record are appropriate factors to consider in assessing the value of a treating physician's opinions. *See* 20 C.F.R. §§ 404.1527(c)(2)(ii)(3)–(4), 416.927(c)(2)(ii)(3)–(4). Moreover, the ALJ's findings are supported by substantial evidence. As the ALJ noted (AR 25), Dr. Devine indicated in June and July 2013 treatment notes that she was unsure of the cause of Barca's edema, and an echocardiogram did not show any cardiac reason for the impairment (AR 1059, 1075). The ALJ also noted that September 2014 treatment notes from Dr. Devine revealed that, after participating in physical therapy for his lymphedema, Barca was experiencing "significant improvement" in his lower extremity edema. (AR 1469; *see* AR 26.)

The ALJ also considered Dr. Devine's treatment notes which indicated that Barca was noncompliant with treatment recommendations. The ALJ stated as follows:

> I find a lack of evidence to support a finding that . . . if [Barca] remained treatment compliant, [he] would have postural or standing limitations as assessed by Dr. Devine. Rather, the record reveals . . . that, when treatment compliant and able to elevate his legs for just a few minutes, [Barca's] edema . . . improve[d] with no evidence of any additional findings noted upon examination to support the functional limitations assessed.

(AR 26 (citing AR 1407).) The treatment note cited in support of this finding indicates that Barca had a book on diabetes but had not read it, had a compression therapy device but had not used it, and was "having difficulty following through with a [treatment] plan." (AR 1407.) Another of Dr. Devine's treatment notes states that Barca was

"again" not taking his prescribed medication, would not stay at Dr. Devine's office to have an EKG or lab work done, was not taking his blood pressure seriously, and was more focused on his "court case" than on his health.[6]  (AR 1462.)  Barca appears to argue that the ALJ was not allowed to consider Barca's lack of compliance with treatment recommendations in conjunction with his analysis of Dr. Devine's medical opinions. (*See* Doc. 14. at 11.)  But there is no support for this argument, and in fact, the law is to the contrary, as discussed above.  *See* SSR 82-59, 1982 WL 31384, at *2 (1982) ("continued failure to follow prescribed treatment without good reason can result in denial or termination of benefits"); *Dumas*, 712 F.2d at 1553 ("Of course, a remediable impairment is not disabling."); *Russell v. Barnhart*, 111 F. App'x 26, 27 (1st Cir. 2004) (per curiam) ("A claimant's failure to follow prescribed medical treatment contradicts subjective complaints of disabling conditions and supports an ALJ's decision to deny benefits."); *Hussnatter v. Astrue*, No. CV-09-3261 (SJF), 2010 WL 3394088, at *22 (E.D.N.Y. Aug. 20, 2010) ("in order to be entitled to [disability] benefits . . . , the claimant is required to follow all prescribed treatment if such treatment can restore his or her ability to work").

---

[6] A treatment note from Dr. John Lippmann similarly indicates Barca's lack of compliance with treatment recommendations, indicating that Barca failed to take his prescribed potassium tablets, appeared to be "in blithe denial that he has a problem [with his weight]," and "says he is unable to eat a healthy . . . diet . . . due to a living situation that . . . makes him unable to prepare healthy meals at home."  (AR 998; *see also* AR 734, AR 1468 ("very poor compliance with remembering meds").)  Another treatment note indicates that Barca himself admitted he did not comply with treatment recommendations.  (*See* AR 1001 ("Patient admits to medication non-compliance.").)

**B.     Dr. Rebhun**

Barca next asserts that the ALJ erred in failing to address Dr. Rebhun's opinion that Barca would be absent from work for more than four days each month.  (*See* Doc. 14 at 12 (citing AR 1264).)  The argument is unpersuasive, as the ALJ was not required to expressly discuss every aspect of Dr. Rebhun's opinions.  *See Bonilla v. Berryhill*, CASE NO. 8:15-CV-2929-T-MAP, 2017 WL 744709, at *4 (M.D. Fla. Feb. 27, 2017) ("The ALJ is not required to refer to every aspect of Dr. Stanley's opinion, provided it is clear . . . that the ALJ considered Plaintiff's impairments as a whole." (citing *Adams v. Comm'r of Soc. Sec.*, 586 F. App'x 531, 533 (11th Cir. 2014))); *Cannon v. Colvin*, Case No. 1:15-CV-01095-SMS, 2016 WL 8730716, at *6 (E.D. Cal. Oct. 14, 2016) ("That the ALJ did not discuss every assessment made by Dr. Palmer was not error, especially where no evidence shows they are material to the disability determination . . . ." (citing *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003))); *see also Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) ("an ALJ is not required to discuss every piece of evidence submitted[, and] [a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered") (internal quotation marks and citation omitted); *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983) (although courts may not accept "an unreasoned rejection of all the medical evidence in a claimant's favor," the Commissioner need not "reconcile explicitly every conflicting shred of medical testimony").

Moreover, the ALJ properly considered the relevant regulatory factors in analyzing Dr. Rebhun's opinions, and the ALJ's analysis is supported by substantial evidence. Acknowledging Dr. Rebhun's status as Barca's treating psychiatrist, the ALJ stated that he gave "[l]ittle weight" to Dr. Rebhun's opinions because they are "internally inconsistent as well as inconsistent with the evidence of record as a whole." (AR 26.) The ALJ explained that the Global Assessment of Functioning (GAF) score assigned to Barca by Dr. Rebhun is more moderate than the marked limitations Dr. Rebhun opined Barca had with respect to performing at a consistent pace and completing a normal workday or workweek without interruption. (*Id.* citing AR 1260–64).) The ALJ further explained that, despite Dr. Rebhun's opinion that Barca would not be able to work a full week, the Doctor failed to indicate how long Barca could work and failed to identify any medically documented findings to support that limitation. (AR 26.) There was no error in the ALJ's analysis, and substantial evidence supports the ALJ's factual findings.

### C.     Therapist Graveline

Barca also contends the ALJ erred in failing to address therapist Graveline's opinion that Barca would be absent from work for more than four days each month. (*See* Doc. 14 at 12 (citing AR 1269).) But again, the ALJ was not required to discuss every aspect of Graveline's opinions. Further, the ALJ did not err in his analysis of these opinions and the ALJ's analysis is supported by substantial evidence.

As noted above, given that Graveline is not a physician or other acceptable medical source under the regulations, his opinions "do not demand the same deference as

those of a treating physician." *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008).

The ALJ was still required to consider the relevant factors in analyzing Graveline's

opinions, however, *see* SSR 06-03p, 2006 WL 2329939, at *3–4; and the ALJ did just

that, acknowledging that Graveline was Barca's treating therapist and giving "limited

weight" to his opinions because they are "inconsistent with the limited findings noted

upon examination throughout the period under review." (AR 26–27.) The ALJ also

found that, similar to the opinions of Dr. Rebhun, Graveline's opinions "fail[] to note

how long [Barca] could work and/or to identify specific medically documented findings

that would support his assessed degree of functional limitation." (*Id.* at 27.) The ALJ

further found that, again similar to Dr. Rebhun's opinions, Graveline's assessment of

Barca's GAF indicated less severe limitations than Graveline's conclusion that Barca

could not sustain fulltime work activity. (*Id.* at 26–27 (citing AR 1265).) There was no

error in this analysis, and substantial evidence supports the ALJ's factual findings.

## IV.    ALJ's Consideration of Barca's Ability to Handle Stress

Barca next contends that the ALJ did not properly consider Barca's inability to

handle stress. (*See* Doc. 14 at 12–13.) Barca explains that, despite asking no questions

about stress at the administrative hearing, the ALJ included a stress limitation in his RFC

determination. (*Id.* at 12.) Citing to SSR 85-15, Barca argues that the ALJ's RFC

determination regarding Barca's ability to handle stressful work environments "was

neither sufficiently thorough nor individualized in assessing what causes [Barca] to feel

stressed." (Doc. 22 at 3.) Barca further asserts that it was improper for the ALJ to define

low-stress work as work that "'require[s] little to no change in the work setting and little to no need for the use of judgment'" without first determining what caused Barca to be stressed. (*Id.* at 4.) Barca states: "The ALJ's error was in failing to inquire [at the administrative hearing] into what *triggers* Mr. Barca's stress." (*Id.*) Without this information, Barca claims, the ALJ could not make a "rational determination of whether a particular work setting will be tolerable." (*Id.*)

The Court is unaware of any law to support Barca's claims, and the record indicates that the ALJ did in fact consider Barca's stress limitations. In particular, the ALJ's decision states that Barca alleges he "is unable to handle stress or any changes in his routine" (AR 22); and the decision cites to pages from two of Barca's Function Reports wherein Barca reported that he cannot handle stress or changes in routine (*id.* (citing AR 509)). The ALJ accounted for Barca's stress limitations in his RFC determination, finding that Barca could only work in a "low[-]stress environment, which is defined as requiring little to no change in the work setting and little to no need for the use of judgment." (AR 21.) This finding is in accord with the opinions of agency consultant Dr. Goldberg, to which the ALJ afforded "great weight." (AR 26 (citing AR 220–34).) Dr. Goldberg opined that Barca was "limited from high[-]stress tasks bec[ause] of low stress tolerance" and "limited from high[-]stress interactions with [the] public and coworkers due to immature interpersonal personality traits." (AR 231.) Substantial evidence supports the ALJ's findings regarding Barca's ability to work in stressful settings, and Barca has demonstrated no legal error in the ALJ's determination

that Barca was able to perform work in a "low[-]stress environment," meaning an environment that "require[es] little to no change in the work setting and little to no need for the use of judgment."  (AR 21.)

Barca cites to SSR 85-15 in support of his claim that the ALJ did not properly account for his stress limitations.  That SSR states: "The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. . . .  Thus, the mentally impaired may have difficulty meeting the requirements of even so-called 'low-stress' jobs."  1985 WL 56857, at *6 (1985).  But of course, each case is taken on its own merits, *id.* at *5 ("Determining whether [mentally impaired] individuals will be able to adapt to the demands or 'stress' of the workplace is often extremely difficult" and requires a thorough "evaluation on an individualized basis."), and here, the evidence indicates that Barca was able to handle a limited amount of stress (*see, e.g.*, AR 943 (driving to Burlington to observe son's wrestling match), AR 1055 (possibly volunteering to help elderly), AR 1166 (has an okay relationship with landlord and neighbors, receives emotional support from friends and church members, continues to take steps to find a job), AR 1407 (working up to six-hour shifts as a cook), AR 1531 (calling coworkers to keep in contact)).  Furthermore, SSR 85-15, 1985 WL 56857, at *3, recommends that ALJs obtain the opinion of a VE to determine the effect that a claimant's limited ability to handle stress has on his ability to perform particular jobs, and the ALJ did so here.  (*See* AR 58–60.)  Specifically, the ALJ asked the VE at the administrative hearing if

Barca could do any of his past work if he was limited to working in a "low[-]stress environment," defining low stress as "requiring little to no change in the work setting, little to no need for the use of judgment" (AR 58–59); and the VE replied that he would be able to do the job of flagger (AR 60). When the ALJ posed a hypothetical involving a claimant who, unlike Barca, "would be unable to deal with any work[-]related stress," the VE stated that that "would eliminate any jobs in the national economy." (*Id.*)

## V.     ALJ's Step-Four Finding of Ability to Do past Relevant Work as a Flagger

Finally, Barca claims the ALJ erred in finding that Barca could perform his past relevant work as a flagger, given that the job requires more standing than Barca could do and more stress than Barca could handle. (*See* Doc. 14 at 13–15; Doc. 22 at 3–7.) Barca claims the VE's testimony that a flagger can elevate his feet for three to five minutes every hour is "nonsense," and in fact, "a flagger is required to stand at all times that he or she is on duty." (Doc. 22 at 5.) In support of this claim, Barca cites to his own testimony at the administrative hearing based on his experience as a flagger, and to the Dictionary of Occupational Titles (DOT) and the Program Operations Manual System (POMS). (*Id.*; *see* AR 46 (Barca testifying that when he worked as a flagger, he stood "all day long for whenever, whatever they needed you" and he was on his feet "[t]he whole time").) Moreover, citing to the U.S. Department of Labor's definition of the flagger job, Barca contends that it is not "low stress," but rather, requires an ability to control personal emotions, exercise sound judgment, and take action in dangerous situations. (Doc. 22

at 6.) Barca claims he could not handle the job because, as Dr. Goldberg opined, he needed to avoid high-stress interactions. (*Id.* at 7; *see* AR 231.)

It is Barca's burden to prove that he was incapable of performing his past relevant work, and he has failed to demonstrate that his past work as a flagger involved more standing or more stress than he could handle. *See Zokaitis v. Astrue*, Civil Action No. 1:10-CV-30, 2010 WL 5140576, at *10-11 (D. Vt. Oct. 28, 2010) (at step four, plaintiff failed to demonstrate that she could not perform her past work as a cashier because she failed to establish that the job was performed in a high-stress context). The evidence attached to Barca's Statement of Facts, including the DOT's and other agencies' descriptions of the flagger job, does not persuade the Court otherwise. (*See* Doc. 14-1–14-4, Exs. A–C.) Moreover, the ALJ was entitled to rely on the VE's testimony, in response to hypothetical questions matching Barca's RFC, to determine whether Barca could do his past relevant work. *See* 20 C.F.R. § 416.960(b)(2) ("We may use the services of vocational experts or vocational specialists, or other resources, such as the 'Dictionary of Occupational Titles' and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your [RFC]."); *Hennes v. Comm'r of Soc. Sec. Admin.*, 130 F. App'x 343, 346 (11th Cir. 2005) ("The ALJ . . . did not err in considering the testimony of the VE in deciding whether Hennes could perform her past relevant work.").

Barca appears to contend that the VE's testimony is inconsistent with the DOT's description of the flagger job. (*See* Doc. 14 at 14; Doc. 22 at 5–6.) SSR 00-4p requires that, if there is an "apparent unresolved conflict" between the VE's testimony and the DOT, the ALJ must inquire further and obtain a "reasonable explanation" for the conflict. 2000 WL 1898704, at *2 (Dec. 4, 2000); *see Overman v. Astrue*, 546 F.3d 456, 462–63 (7th Cir. 2008). Under this SSR, a "conflict" exists between the testimony of a VE and the DOT when the two disagree in categorizing and describing the requirements of the job as performed in the national economy. *See Jasinski v. Barnhart*, 341 F.3d 182, 184–85 (2d Cir. 2003). "Many specific jobs differ from those jobs as they are generally performed [and thus as they are described in the DOT], and the [VE] may identify those unique aspects without contradicting the [DOT]." *Id.* at 185; *see Schmitt v. Astrue*, No. 5:11-CV-0796 (LEK/ATB), 2012 WL 4853067, at *3 (N.D.N.Y. Oct. 11, 2012) ("[T]he DOT need not mention every characteristic of claimants' limitations, as it is 'not comprehensive, but provides only occupational information on jobs as they have been found to occur, but they may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities.'" (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995)).

Here, there does not appear to be a conflict between the VE's testimony and the DOT with respect to the flagger job. *See Martin v. Comm'r of Soc. Sec.*, No. 5:06-CV-720 (GLS/DEP), 2008 WL 4793717, at *12 (N.D.N.Y. Oct. 30, 2008) ("Perceiving no conflict between the DOT and the [VE's] testimony regarding available work," the court

rejected plaintiff's argument that there was an inconsistency.).  Regarding stress, the DOT description of the flagger job does not indicate that an ability to handle stressful situations is required, stating merely that the job requires an ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized situations."  (Doc. 14-2 at 1.)  Additionally, the DOT description states that the flagger job requires only basic communication tasks, such as discussing traffic routing with a supervisor, directing movement of traffic, providing warnings to coworkers, informing drivers of detours, and recording license numbers of traffic control violators for the police.  (*Id.*)  These tasks do not exceed the stress limitations stated in the ALJ's RFC determination and posed to the VE in a hypothetical at the hearing.  (*See* AR 58 (hypothetical limiting Barca to "low stress" jobs, meaning "requiring little to no change in the work setting, and little to no need for the use of judgment").)

With respect to standing, the DOT description of the flagger job states that the job requires the ability to do "[l]ight [w]ork" (Doc. 14-2 at 1), which generally requires the ability to "stand and walk for up to 6 hours a day."  *Mancuso v. Astrue*, 361 F. App'x 176, 178 (2d Cir. 2010) (citing 20 C.F.R. § 404.1567(b)); *see also Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) ("The full range of light work requires *intermittently standing or walking for a total of approximately 6 hours of an 8-hour workday*, with sitting occurring intermittently during the remaining time.") (emphasis added).  The VE's testimony that the flagger job could be performed by a hypothetical claimant who was

required to "sit and elevate their legs for approximately three to five minutes per hour" (AR 58), does not conflict with this description of the job. Moreover, the VE explained that, even if Barca was required to "take three to five minutes an hour to be off task" (AR 59) or to "put his feet up" (AR 61), he could do the flagger job, because "a person usually is allowed 10 percent off task" and "[w]hat they do in that 10 percent of the time is up to them" (*id.*). Barca's counsel did not object to this testimony, but rather, offered a new hypothetical with a different limitation—"be[ing] off task up to a third of the day"—which the VE found would preclude all work. (AR 61.) But that hypothetical was not adopted by the ALJ, as it was not supported by substantial evidence, and thus the VE's testimony in response to it is irrelevant. *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009) ("An ALJ may rely on a [VE's] testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence, and accurately reflect the limitations and capabilities of the claimant involved." (citation omitted)).

Importantly, Barca's step-four argument regarding the ALJ's finding that he was able to perform his past relevant work as a flagger is tied to the ALJ's assessment of Barca's credibility, which Barca does not contest and to which the Court defers, finding it to be supported by substantial evidence. *See Reynolds v. Colvin*, 570 F. App'x 45, 49 (2d Cir. 2014) ("[W]e will defer to [the agency's credibility] determinations as long as they are supported by substantial evidence."). The ALJ found that Barca's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely credible" (AR 22), based on evidence that Barca was able to work six-hour shifts

as a pizza cook, perform personal care activities on his own, do some housework, manage his own finances, drive to and attend his son's wrestling matches, attend church regularly, maintain ongoing relationships with family members and coworkers, consider volunteering to help the elderly, pursue a job search, and get along with his landlord and neighbors (AR 20–25; *see* AR 50, 53, 504–07, 532–34, 943, 1055, 1166, 1531, 1573). The ALJ also considered treatment notes indicating that Barca's symptoms improved when he complied with treatment recommendations. (AR 24; *see* AR 733 ("cellulitis healed in legs," "[n]o edema"), AR 963 (lymphedema "under excellent management" and "avoiding cellulitis"), AR 964 ("doing considerably better"), 1011 (depression "in partial remission for several months"), 1167 (ultrasounds of legs showing "very good arterial blood flow"), 1407 (leg symptoms improved "within a few minutes" after elevated leg and performed ankle pumps), 1469 ("significant improvement" with lymphedema), 1531 (therapy "continues to be quite helpful"), 1532 ("doing considerably better" with depression).) Thus, the ALJ justifiably did not include in his RFC determination Barca's claims that he could handle no stress at all, and did not accept Barca's testimony that the flagger job would require him to stand at all times with no opportunity to take a break to rest his feet.

## Conclusion

For these reasons, the Court DENIES Barca's motion (Doc. 14), GRANTS the Commissioner's motion (Doc. 21), and AFFIRMS the decision of the Commissioner. Judgment to be entered in favor of the Commissioner.

Dated at Burlington, in the District of Vermont, this 8th day of August, 2017.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge